UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Rodney Jones,
                Plaintiff,

                                            Hon. Hugh B. Scott
                                            07-CV-145A

                v.                                  Report
                                                          &amp;
                                             Recommendations

COMMISSIONER OF SOCIAL SECURITY[1],
                Defendant.

      Before the Court are the parties' respective motions for judgment on the pleadings (Docket Nos. 12 and 14).

## INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security that the plaintiff is not disabled and, therefore, is not entitled to disability insurance benefits and/or Supplemental Security Income benefits.

## PROCEDURAL BACKGROUND

      The plaintiff, Rodney Jones ("Jones"), filed the instant application for disability insurance benefits on July 22, 2004 (R. 47-49). His application was denied initially (R. 34, 35-

1

---

[1] For convenience, defendant will be identified by the official title only. See Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g) (action survives despite change in office of Commissioner).

38) and on reconsideration (R. 33, 41-44). The plaintiff requested a hearing (R. 45-46). The hearing was held on August 8, 2002 before an administrative law judge ("ALJ") (R. 364-77). On August 24, 2006, the ALJ found that the plaintiff was not disabled (R. 10-25). The plaintiff requested Appeals Council review of the hearing decision (R. 8-9). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 23, 2007 (R. 4-6).

## FACTUAL BACKGROUND[2]

Jones was born on March 15, 1962 (R. 47, 77) and is a high school graduate (R. 85). He testified that in the past, he had received disability insurance benefits due to a right arm injury (R. 367). Jones stated that he returned to work in 2000 or 2001 (R. 120, 368). The plaintiff's past relevant work includes employment in a warehouse shipping orders (R. 369). This job involved standing and walking most of the time and lifting more than one hundred pounds (R. 92). Previously, the plaintiff did construction work, which involved operating heavy equipment (R. 82). This job involved standing most of the day and lifting up to one hundred pounds (R. 83). The plaintiff stopped working in July 2004, after he fell and injured his right knee (R. 369). Jones claims that he is disabled due to back, arm and knee impairments.

Records from Hunt Club General Medical Care indicate that on March 4, 2002, plaintiff was treated for pain and mild swelling of the right ankle. The physician opined that he was able to work provided that he avoided prolonged standing (R. 132-33). By March 11, 2002, plaintiff's

---

[2] References noted as "(R.__)" are to the certified record of the administrative proceedings.

ankle pain had resolved. He was able to resume normal duty (R. 130-31). On July 7, 2004, plaintiff was treated for traumatic arthritis of the right knee and right shoulder tendonitis. He was told to abstain from work for five days (R. 127-29). On July 12, 2004, plaintiff's right shoulder had improved with increased range of motion and no pain. However, his right knee exhibited moderate effusion and tenderness over the patella (R. 126). On July 20, 2004, plaintiff complained of knee pain. He was unable to use crutches due to shoulder pain (R. 124). On July 26, 2004, an MRI of plaintiff's right knee revealed small right knee joint effusion with a meniscal tear involving the posterior horn of the medial meniscus. The anterior and posterior cruciate ligaments were intact. There was a small popliteal cyst and a lesion involving the distal femur (R. 134).

    Jones had sustained major muscle damage to his right arm in 1992. Dr. Jeffrey R. Friedlander performed a neurological evaluation of the plaintiff on July 29, 2004. (R. 139-42). Dr. Friedlander noted partial amputation of the right biceps, triceps as well as the proximal muscles of the forearm. Some motor deficiency was noted in Jones' biceps, triceps, supinator, pronator teres and flexi carpi muscles of the right arm. Fine successive movements were mildly diminished on the right side. A sensory examination showed allodynia over the right forearm and hand with diminished pinprick over the posterior calves and the left hand. Jones' right biceps and right brachioradialis reflexes were trace. There was positive Tinel's sign over his right wrist; as well as tenderness and spasm of the muscles in the trapezii area and around the cervical, thoracic and lumbar spine. Dr. Friedlander also noted tenderness in the suboccipital areas and over the sacroiliac joints, and suprascapular notches (R. 139-142).

On August 4, 2004, the physician from Hunt Club General Medical Care opined that plaintiff was unable to work until he was seen by an orthopedist (R. 122-23). On August 11, 2004, an MRI of the right knee confirmed a tear of the medial meniscus (R. 149). The impression was right knee medial meniscus tear and previous right upper extremity crush injury. Arthroscopic surgery was recommended (R.150).

On August 19, 2004, an MRI of the plaintiff's cervical spine showed central disc protrusion at the C3-C4 level, bulges at the C5-C6 and C7-T1 levels, disc degeneration and interspace narrowing at the C5-C6 and C6-C7 levels, cervical muscle spasm and moderate spondylosis (R. 174-75).  An MRI of the plaintiff's lumbar spine that same date showed central disc protrusion at the L5-S1 level, a bulge at the L4-L5 level, lumbar muscle spasm and early spondylosis (R. 176-77). Records from Dr. Friedlander indicate that in August and September 2004, plaintiff received physical therapy and lumbar facet block injections (R. 159-70).

On May 27, 2005, Jones was seen by Dr. Graham R. Huckell with respect to his right knee. (R. 191). Examination revealed that the plaintiff's gait was mildly antalgic with a shortened stance on the right side. The right knee showed mild effusion. There was tenderness to palpation over the medial facet of the patella.  Dr. Huckell's diagnosis was chondromalacia, medial meniscus tear and internal derangement of the knee (R. 193). Dr. Huckell recommended a strengthening program and anti-inflammatory medication. He opined that plaintiff had a temporary partial disability with respect to his right knee. (R. 193).  On July 27, 2005, Dr. Huckell reported that plaintiff's right knee had not improved with physical therapy. He requested authorization for Hyalgen injections (R. 196-98). Dr. Huckell administered five injections in September and October 2005 (R. 199-208).

On August 19, 2005, an MRI of plaintiff's lumbar spine revealed disc and bony degenerative changes that were most marked at L5-S1, annular bulge without herniation at L4-L5, and broad-based symmetric herniation and bony changes at L5-S1 causing mild spinal stenosis and moderate foraminal narrowing (R. 250-51, 253-54). On August 19, 2005, x-rays of plaintiff's lumbosacral spine showed disc and bony degenerative changes at L5-S1 (R. 252, 255). On November 11, 2005, the plaintiff underwent back surgery due to lumbar radiculopathy. Dr. Castiglia performed a right L5-S1 hemilaminectomy and microdiscectomy. (R. 188-90). On November 30, 2005, Dr. Castiglia found that plaintiff's strength was symmetric in his lower extremities. Sensation was preserved to light touch. His gait and balance were stable and independent (R. 235).

On January 9, 2006, Dr. Huckell reported that plaintiff's gait was normal in the confines of the examination room (R. 210). Dr. Huckell did not recommend any surgical intervention. He opined that plaintiff had a temporary partial disability and that he would be capable of performing sedentary work (R. 211). On May 8, 2006, Dr. Huckell opined that plaintiff had reached maximal medical improvement with respect to his right knee (R. 215).

The plaintiff was hospitalized at Niagra Falls Memorial Medical Center from February 3, 2006 to February 9, 2006 due to weakness in the left arm and hand (R. 271-351). There was decreased range of motion of the neck and right shoulder. Motor power in both arms was reduced. Deep tendon reflexes were equal and symmetrical. Range of motion was normal in both lower extremities (R. 281). An MRI of the cervical spine revealed a C5-C6 disc herniation with a mass felt on the ventral spinal cord. (R. 282). There was degenerative disc disease of the cervical spine with spinal stenosis. On February 3, 2006, x-rays of plaintiff's cervical spine

showed marked degenerative disc disease at C5-6 and C6-7, but no acute findings (R. 265, 298). On February 6, 2006, an MRI of plaintiff's cervical spine revealed disc dessication, disc space narrowing and herniation at C5-C6. At C2-C3 and C3-C4, there was some bulging of the discs and increased signal present (R. 256-57, 261-62, 269-70, 302-03). On March 27, 2006, Dr. Castiglia found that plaintiff's neck was tender to palpation. He had moderate hesitation with range of motion from side to side. His lower extremity strength was symmetric with no spasticity or clonus. He performed rapid alternating movements with either hand. His grip strength and biceps strength were symmetric. His gait and balance were slow, but steady (R. 230). On May 2, 2006, Dr. Castiglia found increased tenderness in the cervical thoracic junction. Upper extremity strength was unchanged. There was no intrinsic muscle atrophy or weakness. Gait and balance remained slow, but steady (R. 228). On June 13, 2006, the plaintiff underwent a C5-6 anterior cervical diskectomy and fusion with interbody spaces. (R. 222-23).

In a residual functional capacity evaluation dated August 13, 2006, Dr. Castiglia opined that the plaintiff could not sit, stand or walk for any length of time, and that he could not lift or carry any weight. Dr. Castiglia also opined that the plaintiff could not use his hands for pushing, pulling, or simple grasping, but that he could use them for fine manipulations. The plaintiff could use his feet for repetitive movements as in pushing and pulling arm and leg controls. Dr. Castigila opined that the plaintiff could not crawl, climb or reach, and that he should avoid unprotected heights and being around moving machinery (R. 352). Dr. Castiglia opined that the plaintiff was temporarily totally disabled (R. 353).

DISCUSSION

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that his impairment prevents him from returning to his previous type of employment. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which

the plaintiff could perform." Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

>  (1) whether the plaintiff is currently working;
>
>  (2) whether the plaintiff suffers from a severe impairment;
>
>  (3) whether the impairment is listed in Appendix 1 of the relevant regulations;
>
>  (4) whether the impairment prevents the plaintiff from continuing his past relevant work; and
>
>  (5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). However, it should be noted that the ALJ has an affirmative duty to fully develop the record. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing his past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work he has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible

8

with the performance of such work." See Social Security Ruling 82-62 (1982); Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994). The ALJ must then determine the individual's ability to return to his past relevant work given his residual functional capacity. Washington, supra, 37 F.3d at 1442.

In the instant case, the ALJ found that Jones suffered from a combination of impairments that have more than a minimal effect on his ability to perform basic work activity and that imposes significant vocationally relevant limitations that are considered severe: degenerative disc disease in both the lumbar and cervical spine with some radiculopathy into upper and lower extremities, headaches, degenerative joint disease bilateral shoulders and elbows, and right knee patellar chondromalacia, medical meniscus tear and osteoarthritis. (R. 14). The ALJ determined that Jones' impairment did not meet the Appendix I listings. (R. 16). The ALJ then determined that Jones could perform the full range of sedentary work. (R. 17).

The ALJ's determination that Jones can perform a full range of sedentary work is not supported by substantial evidence in the record. In making his determination that Jones could perform sedentary work, the ALJ found the plaintiff's "could reasonably be expected to produce the alleged symptoms," but that Jones' "statements concerning the intensity, persistence and limiting effects" of the symptoms are "not entirely credible." (R. 18). The ALJ stated that "the objective medical evidence and clinical findings ... do not show an impairment or impairments with the degree of severity likely to produce pain and other symptoms to a disabling degree. ..." (R. 18). The ALJ then relied upon the residual functional capacity evaluation provided by Dr. Huckell on May 8, 2006. The ALJ stated that Dr. Huckell's assessment was "given substantial weight as the evidence of record supports some limitations and restrictions emanating from

9

[Jones'] musculoskeletal impairments but does not support limitation or restriction beyond the full range of sedentary work as indicated by [Jones'] neurosurgeon, Dr. Castiglia." (R. 23).

As discussed in more detail above, the medical evidence reveals that Jones suffered from a significant back impairment requiring both lumbar and cervical surgeries. The symptoms relating to this impairment included radiculopathy in his extremities, diminished sensation, and reduced range of motion. After acknowledging this evidence, the ALJ cited to normal findings in the medical records (Jones' ability to perform fine manipulation with either hand; full painless right hip range of motion, normal reflexes except for right extremity). (R. 23-24). These normal findings do not constitute a medical opinion that negates the conclusions of Dr. Castiglia. The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. Balsamo v. Chater, 142 F.3d. 75 (2d Cir. 1998); McBrayer v. Secretary of Health and Human Servs., 712 F.2d. 795, 799 (2d Cir. 1983).

Further, the ALJ's reliance upon Dr. Huckell's residual functional capacity evaluation does not provide substantial support for the ALJ's determination. Initially, it should be noted that Dr. Huckell's opinion that Jones was capable of doing sedentary work was qualified by the phrase "at this time" and was dated July 12, 2006. Because this opinion came some 17 months after the plaintiff's alleged onset date, this opinion, without more, would not necessarily preclude a finding that Jones was disabled for at least a 12 month period. Moreover, the records reflect that Dr. Huckell was treating Jones only with respect to his knee impairment. Thus, the ALJ erred in construing Dr. Huckell's opinion as speaking to any limitations relating to Jones' back impairments.

Finally, if the ALJ had questions or concerns regarding any inconsistencies between Dr. Castiglia's opinion and the clinical findings, the ALJ was obligated to contact Dr. Castiglia to seek more information to clarify those questions or concerns. <u>Clark v. Commissioner of Social Sec.</u>, 143 F.3d. 115, 118 (2d Cir 1998).

Based on the above, the ALJ's determination in this case is not supported by substantial evidence in the record. This matter should be remanded back for further administrative proceedings, including the development of the record and a proper assessment as to the plaintiff's residual functional capacity.

<u>CONCLUSION</u>

For the foregoing reasons, this Court recommends that the decision of the Commissioner be vacated and this matter be REMANDED for further administrative proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

Any objections to this Report & Recommendation *must* be filed with the Clerk of this Court *within ten (10) days* after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a). <u>Failure to file objections to this report & recommendation within the specified time or to request an extension of such time waives the right to appeal any subsequent district court's order adopting the recommendations contained herein.</u> <u>Thomas v. Arn</u>, 474 U.S. 140

(1985); <u>F.D.I.C. v. Hillcrest Associates</u>, 66 F.3d 566 (2d Cir. 1995); <u>Wesolak v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir. 1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.</u>

So Ordered.

*/s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
May 2, 2008